PREET BHARARA
United States Attorney for the
Southern District of New York
By:    CRISTINE IRVIN PHILLIPS
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York   10007
Telephone Nos. (212) 637-2696
Facsimile No. (212) 637-2702
cristine.phillips@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* XING WEI,<br><br>                    Plaintiff,<br><br>                 v.<br><br>YINGSHUN GARMENTS, INC., GOLDEN TOO, INC., AR KNITWEAR, and KBL GROUP INTERNATIONAL LTD.,<br><br>                    Defendants. | 13 Civ. 0055 (LAK)<br><br>**COMPLAINT-IN-INTERVENTION** |
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff-Intervenor,<br><br>                 v.<br><br>YINGSHUN GARMENTS, INC., MARIE ROGERS, IMPORT GLOBAL DESIGNS INC., OLGREM LLC, and NOTATIONS, INC.,<br><br>                    Defendants. | |

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, files this Complaint-In-Intervention, alleging upon information and belief as follows:

## PRELIMINARY STATEMENT

1.   The United States of America brings this action seeking treble damages and penalties against Defendants Yingshun Garments, Inc. ("Yingshun"), Import Global Designs Inc. ("Import Global"), Olgrem LLC ("Olgrem"), Marie Rogers ("Rogers"), and Notations, Inc. ("Notations") (collectively, "Defendants") under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, based on Defendants' knowing and fraudulent evasion of millions of dollars in customs duties owed on women's apparel imported from China.

2.   As set forth more fully below, the United States alleges that between 2009 and 2014 (the "relevant period"), Yingshun, an importer of women's garments manufactured in China by its parent entity, Wuxi Yifeng Garments Co. Ltd. ("Wuxi Yifeng"); Rogers, one of two individuals who operated and served as an officer of Yingshun; Import Global and Olgrem, successor entities to Yingshun created by Rogers; and Notations, a U.S. wholesaler of women's garments and Yingshun's largest customer, conspired to defraud and did defraud the United States by perpetrating a scheme whereby falsely undervalued invoices were presented to U.S. Customs and Border Protection ("CBP") for garments purchased by Notations, manufactured by Wuxi Yifeng and imported by Yingshun.   As a result of Defendants' fraudulent understatement of the value of the garments through the false invoices, Defendants Yingshun, Import Global and Olgrem avoided paying millions of dollars in customs duties, and Defendant Notations received below-market prices on the garments it purchased from Yingshun and Wuxi Yifeng, and other benefits.

2

**JURISDICTION AND VENUE**

3.  This Court has jurisdiction over this action under the FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3730(a), as well as pursuant to the Court's general equitable jurisdiction.

4.  Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a), as well as 28 U.S.C. §§ 1391(b) and (c), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**THE PARTIES**

5.  Plaintiff is the United States of America.

6.  Relator Xing Wei ("Relator") is a resident of Australia and the mother of a former employee of Yingshun.  Relator's son, James Zhu, worked as a sales representative for Yingshun in 2009.

7.  Defendant Yingshun is a New York corporation with its principal place of business in New York, NY.  Yingshun is the wholly owned subsidiary of Wuxi Yifeng, a manufacturer of women's garments located in Wuxi, China.  At all relevant times, Yingshun was engaged in the business of importing garments manufactured by Wuxi Yifeng.

8.  Defendant Rogers was the managing director and one of two management-level employees of Yingshun.  Rogers ran the day-to-day operations of Yingshun, and later Import Global and Olgrem.

9.  Defendant Import Global is a New York corporation with a principal place of business in New York, NY.  Import Global was created by Rogers as a successor entity to Yingshun, in order to continue to perpetrate the fraudulent scheme.

3

10.     Defendant Olgrem is a New York corporation with a principal place of business in New York, NY.   Olgrem was created by Rogers as a successor entity to Import Global, in order to continue to perpetrate the fraudulent scheme.

11.     Defendant Notations is a Pennsylvania corporation with a principal place of business in New York, NY.   Notations purchases garments, typically from overseas factories, and then sells those garments to department stores and other retail stores.   Between 2009 and 2014, Notations regularly purchased garments manufactured by Wuxi Yifeng and imported by Yingshun.

## OTHER INDIVIDUALS AND ENTITIES

12.     Wuxi Yifeng is a manufacturer of women's apparel, primarily sweaters and knitwear, located in Wuxi, China.   At various times, Wuxi Yifeng operated under the names New Wuxi Yifeng Clothing Co., Ltd. and Yushun International Trading Co., Ltd., among others.

13.     "Co-conspirator 1" is the president of Yingshun and the daughter of the owner of Wuxi Yifeng.   Co-conspirator 1 is a citizen of China and has resided in China since 2013.   Co-conspirator 1 is the niece of the Relator.

14.     "Co-conspirator 2" is the owner and manager of Wuxi Yifeng, the garment manufacturer located in Wuxi, China.   Co-conspirator 2 is the mother of Co-Conspirator 1 and the sister-in-law of the Relator.

## FACTS

**I.      Payment of Customs duties**

15.     For all merchandise imported into the United States, an importer or its agent must, using reasonable care, file appropriate documents with CBP that allow CBP to assess the customs duties due on the merchandise.   19 U.S.C. § 1484(a)(1)(B).

16. The documents required to be filed with CBP include, among other things, (i) an entry summary (CBP Form 7501) that declares the value of the merchandise and the applicable duty rate; and (ii) a commercial invoice that provides verification of the value of the merchandise. *See, e.g.*, 19 C.F.R. §§ 141.0a, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a). Generally, the importer is required to deposit estimated duties with CBP at the time of entry. 19 U.S.C. § 1505; 19 C.F.R. § 141.101. The amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate.

17. The value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary. Federal law provides that every importer must file a declaration stating that the values set forth on these documents are accurate. 19 U.S.C. § 1485.

18. The entry summary thus includes a declaration that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . and are true and correct . . . [and that the declarant] will immediately furnish to the appropriate CBP officer any information showing a different statement of facts." CBP Form 7501.

19. Yingshun, and later Import Global and Olgrem, like many other importers, used a customs broker to assist in clearing goods for entry by preparing the entry summary and other necessary paperwork and calculating taxes and duties. The customs brokers hired by Yingshun for this purpose, to whom Yingshun issued a power of attorney, completed the relevant entry summaries based upon information provided by Yingshun.

5

20.     The duty rate for the garments manufactured by Wuxi Yifeng and imported by Yingshun varied depending upon the fiber content of the fabric, but most commonly was 32%, which is the applicable duty rate for sweaters manufactured from man-made fibers.

## II.     The Fraudulent Scheme

### A.     Yingshun

21.     In late 2008, Co-Conspirator 1 relocated from China to New York to establish Yingshun as a U.S. entity, wholly owned by Wuxi Yifeng.

22.     Yingshun's website stated that Wuxi Yifeng was its "parent company" and that Yingshun established a "direct link to our manufacturing in China" with "no middleman" and "[n]o agent's commission."

23.     The business purpose of Yingshun was three-fold:   1) to solicit new U.S. customers to purchase garments manufactured by Wuxi Yifeng; 2) to act as an intermediary between Wuxi Yifeng and those customers; and 3) to serve as importer of record for the garments purchased by the U.S. customers and manufactured by Wuxi Yifeng.

24.     The majority of Yingshun's U.S. customers were garment wholesalers who purchased garments in order to sell them to retail stores.

25.     Virtually all of the garments manufactured by Wuxi Yifeng and sold through Yingshun were sold on a Landed Duty Paid ("LDP") or Delivered Duty Paid ("DDP") basis, meaning that the seller is responsible for all costs associated with importing the garments and the buyer pays one all-in price for the merchandise that incorporates those costs.

26.     Because most of the garments imported by Yingshun were subject to a 32% duty rate, a large majority of the import costs were attributable to customs duties owed to CBP.

27. In both the LDP and DDP transactions, Yingshun, as importer of record, was legally responsible for submitting the necessary documentation to CBP, including the entry summary that stated the value of the garments being imported and the amount of customs duties owed.

28. For garments sold on an LDP or DDP basis, Wuxi Yifeng charged its customers an all-in price that included the cost of the customs duties as well as the other costs attendant to importing the garments, in addition to the cost of the garments themselves.

29. For all of its LDP and DDP transactions during the relevant period, Yingshun and Wuxi Yifeng were employing a double-invoice scheme, whereby Yingshun furnished a commercial invoice to be presented to CBP that under-reported the value of the garments by 75% or more. Based upon these falsely undervalued invoices, Yingshun avoided paying a significant portion of the customs duties that it owed to CBP.

30. The scheme was simple. The commercial invoice shown to CBP was virtually identical to the commercial invoice provided to Yingshun's customer, except that the invoice shown to CBP listed a price for the garments that was grossly undervalued.

31. Specifically, although the average LDP or DDP price for garments manufactured by Wuxi Yifeng was approximately $6.50-$9.20 per garment, the invoices filed with CBP for the same garments routinely listed the price as only $1.00-$2.00 per garment, or less.

32. Yingshun provided these grossly undervalued invoices to the customs brokers who filed the required documentation with CBP on Yingshun's behalf. Yingshun falsely represented to the customs brokers that the invoices were true and accurate.

33. The submission of these fraudulent invoices to CBP and corresponding false representations to CBP as to the value of the garments resulted in Yingshun avoiding thousands

7

of dollars in customs duties for every shipment of garments made during the relevant period, including shipments made to Notations. During the relevant period, Yingshun made hundreds of such shipments to Notations.

34. Initially, Yingshun employed James Zhu, son of the Relator and cousin of Co-Conspirator 1, to aid in procuring new customers for Wuxi Yifeng.

35. During the course of his employment at Yingshun, James learned from Co-Conspirator 1 that Yingshun was providing its customs brokers with false commercial invoices that under-reported the value of the garments being imported.

**B.     Rogers**

36. In early 2009, Yingshun hired Rogers to handle sales and customer relations. Rogers had significant experience in the garment industry, having worked in various capacities in the industry for decades, including owning and operating multiple garment wholesale companies.

37. Rogers assumed the title of "managing director" of Yingshun and received an annual salary of $175,000.

38. Rogers quickly became personally involved in all aspects of Yingshun's business. She managed Yingshun's existing clients, solicited new clients, and facilitated all new sales orders, including negotiating the prices paid by Yingshun's customers. She also managed the logistics involved in the importation process, including managing the brokers and the companies responsible for shipping the garments.

39. Shortly after Rogers began her employment at Yingshun, in 2009, James Zhu left the company. Thereafter, other than temporary or secretarial employees, Rogers and Co-Conspirator 1 were the only employees of Yingshun.

40. Because Co-Conspirator 1's grasp of English was poor, Rogers handled virtually all English-speaking interactions on behalf of Yingshun.

41. When Co-Conspirator 1 returned to China, which occurred 2-3 times per year for extended periods, and following Co-Conspirator 1's permanent return to China in 2013, Rogers was the only permanent, non-secretarial Yingshun employee in the United States.

42. Rogers was aware of, and took actions in furtherance of, Yingshun's fraudulent double-invoice scheme.

43. Specifically, Rogers knew that Yingshun presented one invoice to its customers and a similar but undervalued invoice to CBP.

44. For example, Rogers routinely provided commercial invoices to Notations, but when brokers asked for the same invoices to present to CBP, Rogers refused to provide them, instead directing the brokers to Wuxi Yifeng.

45. Rogers also was aware of, and employed, a "formula" used by Co-Conspirator 2 at Wuxi Yifeng, whereby the LDP price of a garment was calculated by adding just $1.50 to the manufacturing cost of the garment. For the vast majority of the garments manufactured by Wuxi Yifeng, $1.50 was significantly less than the full amount of the customs duties and other importation costs, therefore Rogers' use of this "formula" reflected her understanding that Yingshun intended to pay only a fraction of the customs duties owed.

46. Additionally, on at least one occasion, in 2011, CBP informed Rogers that the value of certain garments imported by Yingshun had been grossly under-reported on the required documentation. Despite this knowledge, Rogers took no steps to change Yingshun's double-invoicing practice on any past or future transactions.

### C. Import Global and Olgrem

47. In March of 2014, Yingshun began to operate under the name Import Global. Business operations for the entity, however, remained unchanged.

48. Rogers asked Yingshun's customers to pay monies owed to Yingshun to Import Global and retroactively changed Yingshun's invoices to state that they were issued by Import Global.

49. Yet despite purporting to be a separate entity, Import Global continued to use Yingshun's customs bond (a form of guarantee required by CBP), identified itself as Yingshun in documentation submitted to CBP, and conducted all other aspects of the importation process as Yingshun.

50. Rogers also, at various times, identified Wuxi Yifeng (which at this point had also changed names several times) as Import Global.

51. Import Global, which in reality was simply Yingshun operating under a different name, continued the fraudulent double-invoice scheme in the same manner as Yingshun had previously.

52. In approximately January 2015, Yingshun/Import Global began to operate under a different entity name, Olgrem.

53. According to Rogers, she began to operate the business under the entity name Olgrem because the United States Attorney's Office had recently issued an investigative subpoena to Import Global.

54. Olgrem assumed all of Yingshun/Import Global's orders and continued Yingshun/Import Global's business operations.

55. Olgrem also continued the fraudulent double-invoice scheme.

**D.     Notations**

56.     Notations is a wholesaler of women's apparel that has been in business since 1979.   During the relevant period, Notations had hundreds of millions of dollars in annual sales revenue.

57.     As of 2009, when Notations began to do business with Yingshun, Notations predominantly acted as its own importer of record for garments that it purchased from overseas manufacturers, meaning that it was responsible for causing the required documents to be filed with CBP and for calculating and paying the correct amount of customs duties.   This type of transaction is known as Freight on Board, Free on Board, or "FOB."

58.     In order to effectuate its FOB transactions, Notations employed a full-time staff in its "imports" department, including, at one time, a licensed customs broker.   The imports department was charged with tracking all shipments, interacting with the customs broker that Notations employed to handle the required submissions to CBP, and reviewing all representations made to CBP by that broker.

59.     Notations also maintained a compliance manual that set forth in detail numerous actions that Notations' overseas manufacturers were required to take in order to ensure that Notations was complying with the U.S. customs laws.

60.     Yet when Notations began to do business with Yingshun and Wuxi Yifeng in early 2009, Notations had begun to make a shift in its operational model, opting to engage in significantly fewer FOB transactions, and instead choosing to do business with entities that offered LDP or DDP transactions.

61.     Notations changed from primarily FOB to primarily LDP or DDP transactions because doing business with companies that engaged in LDP/DDP transactions was cheaper for

Notations, and because every $.05 saved on the cost of a garment increased Notations' profit margin by 1/8 of a percentage point.

62.     Notations took no steps whatsoever to learn about the business dealings of its LDP/DDP vendors, including whether those entities had any knowledge of the U.S. customs laws, had previously been found to be violating those laws, or had otherwise engaged in illegal or unscrupulous business practices.

63.     When Notations purchased garments on an LDP or DDP basis, the imports department at Notations still tracked the shipments and still interacted with the customs broker and shipping companies as needed.   The only difference in Notations' conduct, as compared to its FOB transactions, was that Notations sought to avoid obtaining any knowledge of the representations that the importer of record made to CBP.

64.     Contrary to its compliance practices for FOB transactions, Notations took the position that for LDP or DDP transactions, Notations had no obligation whatsoever to detect instances in which the entity serving as the importer of record was defrauding U.S. Customs, even if presented with information suggesting that fraud was occurring.

65.     For example, according to Notations' import manager, who was the person primarily responsible for ensuring Notations' compliance with the customs laws in FOB transactions during the relevant period, even if she had been confronted with a grossly undervalued invoice created by an overseas manufacturer, which she knew was likely to be used to defraud CBP, it would not have been part of her job responsibilities to take any steps to correct that invoice if the transaction was LDP or DDP.

66.     In fact, on at least one occasion, Notations' import staff did receive a grossly undervalued invoice created by Wuxi Yifeng for garments purchased by Notations.   Despite the

fact that the invoice was easily recognizable as undervalued, and despite the fact that Notations was aware that an undervalued invoice presented to CBP would result in the fraudulent avoidance of customs duties, no one at Notations took any steps to cause Wuxi Yifeng or Yingshun to fix the invoice. Nor did Notations alert CBP to this fraud or take any other steps to stop the fraud. Thereafter, Notations' business relationship with Yingshun continued unchanged.

### E. The Conspiracy

67. In reality, however, Yingshun, Wuxi Yifeng and Notations had an agreed-upon manner of conducting business in furtherance of Yingshun's double-invoice scheme; the purpose of the agreement was to aid Yingshun in avoiding detection of its scheme by CBP or others.

68. Specifically, the commercial invoices Yingshun provided to Notations for all garments that Notations purchased, which were issued by Wuxi Yifeng, were highly irregular, lacking basic information that would be included in any legitimate invoice, such as the name and address of the invoice recipient.

69. Contrary to industry practice, Notations accepted these irregular invoices and at no time requested that Yingshun or Wuxi Yifeng correct the irregularities. Even when Notations' bank flagged the lack of basic information in the invoices, and refused to pay Wuxi Yifeng without express approval by Notations, Notations continued to approve payment of the invoices and did not require Wuxi Yifeng to issue new invoices or to include all relevant information in future invoices.

70. Notations likewise furnished Yingshun and Wuxi Yifeng with irregular purchase orders that lacked a purchase price, which was inconsistent with industry practice and obscured the fact that Yingshun was grossly undervaluing the goods purchased by Notations in its

submissions to CBP. The Notations purchase orders also were made out to Yingshun, despite the fact that Wuxi Yifeng invoiced Notations directly for the garments that Notations purchased and Notations paid Wuxi Yifeng directly.

71.     Additionally, on each of the entry summaries presented to CBP for garments purchased by Notations, Yingshun falsely represented that it was not affiliated with Wuxi Yifeng, despite being its wholly owned subsidiary.

72.     Each of these false and irregular documents, when examined together, create the false impression that Wuxi Yifeng was selling its garments to Yingshun for a low price as reflected in Wuxi Yifeng's undervalued invoices (in one arms-length transaction), and that Yingshun was, in turn, acting as a middleman and re-selling the garments to Notations at a marked-up price (in a separate, arms-length transaction), as reflected in Notations' purchase orders directed to Yingshun.

73.     Notations and Yingshun created and accepted these documents that gave a false impression regarding the nature of the transactions, in order to mask the double-invoice scheme, should it raise questions with CBP or any other third party.

74.     Rogers played a direct role in this conspiracy, including by transmitting the irregular invoices to Notations and accepting the irregular purchase orders, both of which she knew to be false and/or misleading.

75.     When Yingshun began to do business as Import Global and then Olgrem, Notations and the new entities did not change their course of dealings, but instead maintained their conspiratorial conduct.

76. The scope of the conspiracy between Notations and Yingshun did not end with the double-invoice scheme, however; it extended to additional misrepresentations and fraud against CBP and Notations' retail customers.

77. Specifically, Notations falsely represented to one of its retail customers, which was conducting an audit of Yingshun, that Notations examined all documentation that Yingshun submitted to CBP to ensure its accuracy; in fact, the opposite was true.

78. Notations also directed Wuxi Yifeng to use the manufacturer ID number for another factory on the care labels attached to its garments, in order to deceive one of Notations' retail customers that was requiring Wuxi Yifeng to undergo a factory inspection. Notations explained that even if Wuxi Yifeng failed the factory inspection, using another factory's ID number would allow Wuxi Yifeng to continue to manufacture the garments that Notations would later sell to the retail client.

79. Notations also engaged in the practice of purchasing fabric for Yingshun, known in the garment industry as an "assist," the price of which must be included when calculating and declaring the value of the merchandise on entry documents filed with CBP. Yet Notations took no steps to determine whether Yingshun was including the value of the fabric in its representations to CBP, the omission of which would result in additional customs duties being fraudulently avoided. In fact, Yingshun expressly represented to Notations that it was not including the value of the fabric in the garment price, yet Notations took no action to prevent or report these misrepresentations to CBP.

80. Throughout Notations' business relationship with Yingshun, which took place between 2009 and 2014, Notations placed orders for more than 1.8 million garments. Through

15

its double-invoice scheme, Yingshun under-reported the value of each of these garments to CBP and, as a result, avoided paying millions of dollars in customs duties.

81.   Notations benefited from the scheme by receiving below-market prices on garments from Wuxi Yifeng, in addition to an excessive number of "chargebacks," or price breaks taken after the garments had been delivered, which created millions of dollars in additional savings for Notations.

82.   Yingshun also, during the relevant period, paid approximately $200,000 to a bank account maintained by an off-shore entity known as Notation Ltd.

### FIRST CLAIM
### (as against all Defendants)

**Violation of the False Claims Act:   Reverse False Claims**
**(31 U.S.C. § 3729(a)(7) (2006), and as amended, 31 U.S.C. § 3729(a)(1)(G))**

83.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

84.   The Government seeks relief against all Defendants under Section 3729(a)(1)(G) of the False Claims Act.

85.   As set forth above, Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States.

86.   The Government incurred losses relating to customs duties underpaid by Defendants because of their wrongful and fraudulent conduct.

87.   By virtue of the false records or statements made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

## SECOND CLAIM
### (as against all Defendants)

### Violation of the False Claims Act:   Conspiracy
### (31 U.S.C. § 3729(a)(3) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(C))

88. The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

89. The Government seeks relief against all Defendants under Section 3729(a)(1)(C) of the False Claims Act.

90. As set forth above, the Defendants conspired to make, use, or cause to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States.

91. The Government incurred losses relating to customs duties underpaid by Defendants because of their conspiracy to commit wrongful and fraudulent conduct.

92. By virtue of Defendants' conspiracy to make false records or statements in order to avoid paying customs duties to the United States, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands judgment against Defendants as follows:

    A.    Treble the United States' damages, in an amount to be established at trial, plus an $11,000 penalty for each false claim submitted in violation of the False Claims Act;

    B.    Award of costs pursuant to 31 U.S.C. § 3792(a)(3); and

    C.    Such further relief as is proper.

Dated: New York, New York
         September 22, 2016

         PREET BHARARA
         United States Attorney
         Southern District of New York
         Attorney for the United States of America

By:    s/Cristine Irvin Phillips
         CRISTINE IRVIN PHILLIPS
         Assistant United States Attorney
         86 Chambers Street, 3rd Fl.
         New York, New York 10007
         Tel. (212) 637-2696
         Fax (212) 637-2702
         cristine.phillips@usdoj.gov